

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

––––––––––––––––––––––––––––––––––––

TIMOTHY NICHOLS, *as Authorized
Administrator of the Estate of Samual Nichols*,

       Plaintiff,

    v.

LIVINGSTON COUNTY, *et al.*,

       Defendants.

––––––––––––––––––––––––––––––––––––

**DECISION AND ORDER**

6:18-cv-06669 EAW

## INTRODUCTION

Plaintiff Timothy Nichols ("Plaintiff"), proceeding *pro se*, commenced this action on August 4, 2018, in New York State Supreme Court, Livingston County. (Dkt. 1-1 at 2). Plaintiff purports to bring this action on behalf of the estate of his deceased son, Samual Nichols ("Decedent"), as well as "in his individual capacity as a parent[.]" (*Id.* at 3; Dkt. 15-1 at 24). The matter was removed to this Court on September 19, 2018. (Dkt. 1).

Currently before the Court are three motions: (1) a motion to dismiss filed by defendants the State of New York, the State University of New York at Geneseo ("SUNY Geneseo"), and Sarah Covell LMHC ("Counselor Covell") (collectively the "State Defendants") (Dkt. 2); (2) a motion to dismiss filed by defendants Livingston County, Livingston County Coroner Phil Granshaw ("Coroner Granshaw"), Livingston County Deputy Sheriff Chad Draper ("Deputy Draper"), Livingston County EMS ("EMS"), Livingston County Sheriff Thomas Dougherty ("Sheriff Dougherty"), and the Livingston

County Sheriff's Department (collectively the "County Defendants") (Dkt. 11); and (3) a motion for leave to file an amended complaint filed by Plaintiff (Dkt. 15).

For the reasons discussed below, the Court grants Plaintiff's motion for leave to amend. The Court further grants the pending motions to dismiss with respect to all of Plaintiff's federal claims, and remands the remaining state law claims to the state court.

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Complaint. As required at this stage of the proceedings, the Court treats Plaintiff's allegations as true.

At the time of his death, Decedent was a second-year student at SUNY Geneseo, residing in an on-campus dormitory. (Dkt. 1-1 at 4). The dormitory employed "paid and trained" resident advisors and resident directors, who were responsible for "monitoring and supervis[ing]" the students living therein. (*Id.*). SUNY Geneseo also has a university police department (the "UPD"), "whose mission is to serve to protect students, faculty and staff of SUNY Geneseo within the campus and grounds of SUNY Geneseo." (*Id.*).

Beginning in December of 2016, Decedent attended appointments at the on-campus SUNY Geneseo Health and Counseling Services, "over concerns he was having related to marijuana use." (*Id.* at 5). In mid-January of 2017, Decedent "began weekly, one-hour counseling sessions" with Counselor Covell. (*Id.*). Decedent expressed suicidal ideation to Counselor Covell and to "several close friends." (*Id*) Decedent met with Counselor Covell on April 30, 2017, for his usual one-hour session. (*Id.*). This session occurred shortly after Decedent had "an emotional conversation with his girlfriend, Madeline

Devincenzo ["Devincenzo"][1]," in which she "expressed a desire for 'space' during the first week of May," which was "'finals week', a high pressure period of time when students study and take final examinations at the end of the semester." (*Id*). Plaintiff alleges that Counselor Covell failed to take reasonable actions in response to Decedent's expressed suicidal ideation, including by failing to contact emergency medical professionals and by failing to alert Decedent's parents. (*Id*. at 6).

On the evening of May 5, 2017, there was a party in the dormitory suite shared by Decedent. (*Id*. at 7). After the party, Decedent had "an emotional encounter" with Devincenzo and an individual named Joseph Kanlong ("Kanlong") both inside and outside the dormitory, which was witnessed by students, staff, and employees of SUNY Geneseo. (*Id*. at 7-8). Plaintiff alleges that the "SUNY Geneseo staff and employees charged with supervising and monitoring students . . . did nothing to assist Decedent despite his blatant and obvious emotionally distressed state of mind and in spite of the high drama unfolding in plain sight in the on campus Ontario Dormitory." (*Id*. at 8).

On the morning of May 6, 2017, Devincenzo and another SUNY Geneseo student, Alexis Leslie ("Leslie"), attempted to call a SUNY Geneseo telephone "help line" to seek help for Decedent. (*Id*. at 7). SUNY Geneseo had promoted the "help line" to students as "a resource line for SUNY Geneseo students who may be experiencing or may be concerned that another student is experiencing mental health, substance abuse or other

---

[1]     Plaintiff alternatively spells this surname as "Devincenzo" and "Divencenzo." (*See* Dkt. 1-1 at 5, 13).  For consistency's sake, the Court has spelled it as "Devincenzo" throughout this Decision and Order.

problems[.]" (*Id.*). The "help line" was not in operation and no one answered Devincenzo's and Leslie's call. (*Id.*).

Decedent began a cellphone call with Devincenzo at 11:17 a.m. on May 6, 2017. (*Id.* at 12). At 11:18 a.m. on May 6, 2017, Kanlong called UPD to report that Decedent "might be in danger of hurting himself at an off campus location." (*Id.*). Kanlong told the UPD dispatcher that Devincenzo was on the phone with Decedent and was "attempting to keep him on the phone until police arrived at Fallbrook Falls." (*Id.*).

At approximately 11:20 a.m. on May 6, 2017, UPD transferred Kanlong's emergency call to Livingston County Emergency 911. (*Id.* at 13). Kanlong reported that he was concerned Decedent might "step off" the top of "the falls off of route 20A," which the 911 dispatcher "immediately identified as 'Fallbrook Falls[.]'" (*Id.*). "[A] few seconds later," the 911 dispatcher "reported the emergency of a person in need of assistance at Fallbrook Falls over the police radio." (*Id.* at 13).

Plaintiff alleges that SUNY Geneseo failed to take adequate measures to prevent student suicides, including by failing to train its faculty and students about warning signs. (*Id.* at 8). Plaintiff further alleges that the UPD has "created an atmosphere in which students do not trust them and do not seek out help from them," and has further confused students by providing "conflicting and confusing instructions as to what to do in a medical and mental health emergency[.]" (*Id.*). Plaintiff particularly faults SUNY Geneseo and the UPD for having "refuse[d] to participate in the Livingston County E-911 system, opting instead to promote is own ten digit number," which Plaintiff contends was unnecessarily confusing and "creates an unnecessary and deadly barrier" to students attempting to

procure emergency assistance. (*Id.* at 9). According to Plaintiff, had UPD participated in the E-911 system, it would "have provided aid to Decedent at least two minutes earlier on the morning of May 6, 2017." (*Id.*).

At approximately 11:20 a.m. on May 6, 2017, Sheriff Dougherty, who was off-duty and on his way home, heard the 911 dispatch call and "immediately responded," stating that "he would handle the emergency call due to his immediate proximity to Fallbrook Falls." (*Id.* at 14). Sheriff Dougherty arrived at Fallbrook Falls "between approximately 11:21 AM and 11:23 AM," and other members of the Livingston County Sheriff's Department "also began to respond" to the emergency call. (*Id.*). Plaintiff alleges that Sheriff Dougherty was "fully physically and mentally capable of aiding Decedent in a matter of seconds upon arrival," but that he "acted in cowardice and chose not to assist Decedent out of fear" until another officer arrived. (*Id.*).

Deputy Draper arrived at Fallbrook Falls at approximately 11:25 a.m. on May 6, 2017. (*Id.*). Deputy Draper reported that when he arrived, Sheriff Dougherty was "in the process of moving down the trail," and Deputy Draper followed behind him. (*Id.*). Deputy Draper further reported that he looked over the edge of the falls and saw Decedent at the bottom, facedown in the water. (*Id.* at 16). Plaintiff disputes Sheriff Dougherty's and Deputy Draper's report that they did not see Decedent at the top of Fallbrook Falls when they arrived on the scene, asserting that this report is inconsistent with cellphone records indicating that Devincenzo's cellphone remained connected to Decedent's until 11:28 a.m. (*Id.*).

- 5 -

Deputy Draper reported pulling Decedent toward a shallow part of the pool of water at the bottom of Fallbrook Falls "at the direction of EMS to avoid the possibility of hypothermia in Decedent." (*Id.* at 16). Plaintiff claims that this action by Deputy Draper "possibly exacerbated severe yet survivable bodily injuries suffered by Decedent" and further "severely exacerbat[ed] his pain and suffering." (*Id.*).

Plaintiff further alleges that Sheriff Dougherty, "in order to conceal his cowardice and mistakes," began taking additional wrongful actions, including: (1) failing to call for a rescue helicopter; (2) failing to order an investigation in the events leading up to Decedent's death, including failing to secure evidence and interview key witnesses; and (3) "interfering in the death investigation" by "unlawfully and immorally keeping Decedent's body at the scene for nearly two hours." (*Id.* at 17). Plaintiff claims that Coroner Granshaw committed "dereliction of duty" because he allowed Sheriff Dougherty to "usurp and undermine" his authority, and that Coroner Granshaw wrongly allowed Sheriff Dougherty to "delay by nearly two hours the transport of the body of Decedent to the Monroe County Medical Examiner[.]" (*Id.* at 17-18). Plaintiff also alleges that Coroner Granshaw prematurely declared Decedent's death a suicide, in an attempt to "short-circuit and effectively end further investigation into the events leading to the death of Decedent by the Sheriff's Department[.]" (*Id.* at 18). Plaintiff further faults Coroner Granshaw for having allowed a mere acquaintance of Decedent's to identify his body. (*Id.* at 19). Sheriff Dougherty is also alleged to have "discouraged" Decedent's parents "from rushing to Geneseo, New York," following Decedent's death, and to have instead "persuaded them to

stay home, in Latham, New York," thereby preventing them from viewing and identifying Decedent's body. (*Id.*).

Plaintiff alleges that Decedent could have survived his injuries if he had received "immediate, appropriate and competent EMS assistance," but that EMS instead allowed Sheriff Dougherty to "determine care plan." (*Id.* at 19-20). Plaintiff further alleges that EMS negligently failed to transport Decedent to a hospital after he was extracted from the bottom of Fallbrook Falls and further negligently failed to administer pain medication. (*Id.* at 20-21).

Deputy Draper and Sheriff Dougherty met with Plaintiff on July 27, 2017, at which time Deputy Draper told Plaintiff that Decedent "had a pretty good gash to the back of his head" at the time of his death, caused by having hit a protruding ledge after stepping off the top of Fallbrook Falls. (*Id.* at 21). Plaintiff claims this was a lie, and states that the Monroe County Medical Examiner's autopsy report did not show any head wounds or abrasions to Decedent's head of any kind. (*Id.*).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on August 4, 2018, in New York State Supreme Court, Livingston County. (Dkt. 1-1). The matter was removed to this Court on September 19, 2018, by Livingston County EMS (Dkt. 1); the other Defendants subsequently consented to the removal (Dkt. 5; Dkt. 10).

The State Defendants filed a motion to dismiss the Complaint on September 26, 2018. (Dkt. 2). The County Defendants filed a motion to dismiss the Complaint on October 19, 2018. (Dkt. 11). On November 2, 2018, Plaintiff filed his response to the

State Defendants' motion to dismiss, and a motion for leave to file an amended complaint. (Dkt. 14; Dkt. 15). Plaintiff filed his response to the County Defendants' motion to dismiss on November 15, 2018. (Dkt. 20).

The State Defendants filed reply papers in further support of their motion to dismiss on November 9, 2018 (Dkt. 19), and filed a response to Plaintiff's motion for leave to amend on November 27, 2018 (Dkt. 25). The County Defendants filed reply papers in further support of their motion to dismiss on November 26, 2018 (Dkt. 23), and filed a response to Plaintiff's motion for leave to amend on November 27, 2018 (Dkt. 24).

## DISCUSSION

### A.    Motion for Leave to Amend

As a threshold matter, the Court considers Plaintiff's motion for leave to file an amended complaint. (Dkt. 15). Plaintiff has included with his motion a proposed amended complaint (Dkt. 15-1) that purportedly clarifies his constitutional claims. (*See* Dkt. 15 at 2). "Plaintiff does not seek to add additional facts" in the proposed amended complaint. (*Id.*).

The Federal Rules of Civil Procedure provide that a plaintiff may amend his complaint once as of right within "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(B). "When a plaintiff seeks to amend his or her complaint against multiple defendants, each defendant is treated separately under Rule 15 for purposes of amending as of right." *Cowan v. Miller*, No. 2:15-CV-12428, 2016 WL 4362868, at *2 (E.D. Mich. Aug. 16, 2016) (collecting cases); *see also Isaacs v. Trustees of Dartmouth Coll.*, No. 17-

CV-40-LM, 2017 WL 2881130, at *1 (D.N.H. July 6, 2017) (same) (collecting cases). In this case, the County Defendants filed their motion to dismiss under Rule 12(b) on October 19, 2018 (Dkt. 11), and Plaintiff sought to amend his complaint less than 21 days later, on November 2, 2018 (Dkt. 15). Accordingly, as to the County Defendants, Plaintiff was entitled to file an amended complaint as of right, and so the Court "will consider plaintiff's proposed amended complaint as an amended complaint filed as of right in accordance with Rule 15(a)(1) of the Federal Rules of Civil Procedure." *Boyd v. Doe #1*, No. 18-CV-1333(TJM)(ATB), 2019 WL 1771501, at *1 (N.D.N.Y. Apr. 23, 2019).

With respect to the State Defendants, Plaintiff was not entitled to amend his complaint as of right at the time he filed his motion for leave to amend, because more than 21 days had elapsed from the filing of the State Defendants' motion to dismiss under Rule 12(b). However, the State Defendants' sole argument in opposition to Plaintiff's motion for leave to amend is that Plaintiff's "proposed amended complaint suffers from the same deficiencies as his original complaint." (Dkt. 25 at 3). Accordingly, and in the exercise of its discretion and for purposes of judicial efficiency, the Court finds it appropriate to allow Plaintiff to file his proposed amended complaint against all Defendants, and to assess the pending motions to dismiss in light of the Amended Complaint. *See Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 362 (W.D.N.Y. 2013) (explaining that when a plaintiff amends his complaint while a motion to dismiss is pending, "a court may either deny the motion as moot or consider it in light of the amended pleading.") (internal citation omitted)). The Court therefore grants Plaintiff's motion for leave to amend and will assess the pending motions to dismiss in light of the allegations in the Amended Complaint.

**B.      The State Defendants' and County Defendants' Motions to Dismiss**

####      1.      Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen*

*v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In this case, as discussed further below, Plaintiff has asserted a number of federal constitutional claims pursuant to 42 U.S.C. § 1983. "Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Further, § 1983 "itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Id.* "In order to maintain a § 1983 claim, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist.*, 348 F. Supp. 2d 32, 36 (S.D.N.Y. 2004).

## 2. Plaintiff has Failed to Allege a Viable Federal Claim

This Court's jurisdiction over the instant matter is premised on the assertion of federal constitutional claims. In particular, the Amended Complaint purports to assert the following federal claims: (1) violation of Decedent's constitutional rights to privacy, to be free from deprivation of life and liberty without due process of law, and to freely associate with one's family and loved ones; (2) conspiracy to deprive Decedent of the afore-mentioned constitutional rights; (3) municipal liability for the aforementioned constitutional violations; and (4) deprivation of Decedent's civil rights in violation of 42

U.S.C. § 1985 (Dkt. 15-1 at 29-34). Plaintiff also purports to assert a claim for intentional infliction of emotion distress pursuant to 42 U.S.C. § 1983. (*Id.* at 35). Finally, although Plaintiff has not included an express equal protection claim in his Amended Complaint, his motion for leave to amend indicates that he intended to do so. (*See* Dkt. 15 at 2). For the reasons discussed below, the Court finds that none of these asserted federal causes of action states a claim as to which relief may be granted.

###### a. **Right to Privacy**

While federal courts have recognized a constitutional right to privacy, "[t]he exact nature and scope" of that right has "never been fully defined." *Barry v. City of N.Y.*, 712 F.2d 1554, 1559 (2d Cir. 1983). The Second Circuit has recognized two distinct kinds of interests involved in so-called right to privacy cases—a "confidentiality interest" in "avoiding disclosure of personal matters," and an "autonomy interest" in "independence in making certain kinds of important decisions." *Id.* (quoting *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977)).

Here, Plaintiff has not plausibly alleged an invasion of either of these interests. First, with respect to the confidentiality interest, there is no allegation in the Amended Complaint that "deeply personal, confidential information" about either Plaintiff or Decedent was disclosed by any Defendant.[2] *Anderson v. Duke*, No. 904-CV-0030 NAM/DEP, 2008 WL 238557, at *7 (N.D.N.Y. Jan. 28, 2008) (dismissing claim for breach

---

[2]     The Amended Complaint is somewhat unclear as to whether the various claims are asserted on behalf of Decedent's estate or on behalf of Plaintiff in his individual capacity. In light of Plaintiff's *pro se* status, the Court has considered both possibilities where appropriate.

- 12 -

of right to privacy where there was no allegation that the defendants had wrongfully disclosed protected personal information).

Second, with respect to the autonomy interest, Plaintiff has not alleged that any Defendant in this case prevented Decedent or Plaintiff from making any important personal choices free from unwarranted government intrusion. For example, there is no allegation that Decedent requested medical treatment that was not provided, or that he was denied medical treatment he had requested. To the extent that Plaintiff may be claiming that Sheriff Dougherty interfered with Plaintiff's personal autonomy in deciding whether to identify Decedent's body, this claim fails. Plaintiff alleges only that Sheriff Dougherty discouraged him from "rushing" to Geneseo and "persuaded" him to remain at his home in Latham, which ultimately resulted in Plaintiff not being able to identify Decedent's body. (*See* Dkt. 15-1 at 18). As such, even assuming that the right to decide whether or not to view Decedent's body was constitutionally protected, *see Washington v. Glucksberg*, 521 U.S. 702, 727 (1997) (noting that not "all important, intimate, and personal decisions" are constitutionally protected), Plaintiff has not alleged that he was actually prevented from making that decision of his own volition.

Accordingly, Plaintiff's right to privacy claims fail as a matter of law because he has not plausibly alleged that he was deprived of a protected privacy interest.

### b.   Substantive Due Process

Plaintiff next alleges that Decedent was deprived of his right to substantive due process by Defendants. The Court finds that Plaintiff has not stated a plausible substantive due process claim.

As the Supreme Court has explained, the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without due process of law, but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (quotation omitted). Accordingly, "[i]t is not enough [to support a substantive due process claim] to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007).

The Second Circuit recognizes two narrow exceptions to the general rule that the State has no affirmative constitutional obligation to prevent harm to its citizens. "First, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a special relationship with the victim. Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Matican v. City of N.Y.*, 524 F.3d 151, 155 (2d Cir. 2008) (internal citations and quotations omitted).

With respect to the first of these exceptions, the Second Circuit has "focused on involuntary custody as the linchpin of any special relationship exception." *Id.* at 156; *see also Briggs v. Cty. of Monroe*, 293 F. Supp. 3d 379, 388 (W.D.N.Y. 2018) ("[T]he Court is not aware of any case in which the special relationship exception applied under circumstances where the individual was not in the physical custody of law enforcement or the government.") (granting summary judgment on substantive due process claim where

the plaintiff's decedent committed suicide after a stand-off with law enforcement). In this case, there is no allegation that Decedent was at any time in the custody of any Defendant, nor is there any other basis for application of the "special relationship" exception.

As to the state-created danger exception, "under this exception, state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence." *S.W. ex rel. Marquis-Abrams v. City of N.Y.*, 46 F. Supp. 3d 176, 203-04 (E.D.N.Y. 2014) (quotation omitted). It is only in a "rare case" that "the state-created danger exception might apply to a situation where the victim committed suicide." *Briggs*, 293 F. Supp. 3d at 379. This is not such a case. It is clear from Plaintiff's allegations that the danger to Decedent (that is, his intention to commit suicide) "existed before law enforcement arrived on the scene." *Id.* Accepting as true Plaintiff's claim that Sheriff Dougherty failed to engage with Decedent when he arrived at Fallbrook Falls, that kind of passive failure to intervene does not satisfy the requirements of the state-created danger exception. *See Matican*, 524 F.3d at 157 (explaining that state-created danger exception does not apply to passive conduct, such as "failing to take action even though suspicious circumstances may have counseled an active role").

In his opposition to the County Defendants' motion to dismiss, Plaintiff cites cases from district courts in the Eleventh Circuit, as well as the Eleventh Circuit's decision in *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300 (11th Cir. 2003), in support of his argument that he has stated a substantive due process claim. (*See* Dkt. 20 at 4-8). These cases are inapposite. As the Eleventh Circuit noted in *Waddell*, that court no longer applies "the 'special relationship' and 'special [state-created] danger' doctrines," and has not done

so since 1999. (*Id.* at 1305 (citing *White v. Lemacks*, 183 F.3d 1253, 1257-59 (11th Cir.1999)). However, the Second Circuit has never abandoned the special relationship and state-created danger inquiries, and, to the contrary, still routinely applies them in assessing the viability of substantive due process claims. *See, e.g., Hirsch v. N.Y,* 751 F. App'x 111, 115 (2d Cir. 2018) ("This Circuit's state-created danger jurisprudence creates a high bar for a plaintiff to clear. . . ."); *Ultegra LLC v. Mystic Fire Dist.,* 676 F. App'x 33, 35 (2d Cir. 2017) (applying state-created danger exception); *Urbina v. City of N.Y.,* 672 F. App'x 52, 55 (2d Cir. 2016) (affirming dismissal of due process claim for failure to protect where there was no plausible allegation of a special relationship). This Court is bound to follow the law as interpreted by the Second Circuit, regardless of whether it conflicts with the position of another federal appellate court. Accordingly, Plaintiff's reliance on this out-of-circuit caselaw is misplaced.

In sum, Plaintiff has failed to plausibly allege that either of the narrow exceptions to the general rule that there is no substantive due process right to be protected from private harms applies in this case. Accordingly, Plaintiff has failed to allege a viable substantive due process claim.

### c.    **Right to Free Association**

Plaintiff has also not plausibly alleged that either he or Decedent was deprived of the right to free association. "The Supreme Court has recognized a right of association with two distinct components—an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive

conduct." *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999). In this case, it is the first of these rights—the right to intimate association—that is implicated. In this regard, the Second Circuit has noted that the government may not affirmatively seek to end a protected intimate relationship, nor may it retaliate against an individual because of actions taken by his intimate associates. *Id.* at 43-44.

Here, Plaintiff has not alleged that Defendants took any affirmative steps to interfere in Decedent's or Plaintiff's intimate relationships. It appears that the basis for this claim is the fact that Decedent's death deprived Plaintiff of his continued companionship. However, as the Court has already explained in detail, Defendants had no affirmative constitutional obligation to prevent Decedent from harming himself. Simply put, nothing about the circumstances surrounding Decedent's death implicates the right to free association.

### d.     Intentional Infliction of Emotional Distress

Plaintiff asserts a claim for intentional infliction of emotional distress, purportedly pursuant to § 1983. (*See* Dkt. 15-1 at 35-36). However, "there is no federal law or constitutional principle on which to base such a claim." *Lamont v. City of N.Y.*, No. 12-CV-2478 WFK JMA, 2014 WL 4829328, at *7 n.7 (E.D.N.Y. Sept. 29, 2014). In other words, Plaintiff cannot state a § 1983 claim for intentional infliction of emotional distress, because such a claim does not implicate the Constitution or any other federal law. Accordingly, the Court will interpret this claim as "for the New York common law tort of intentional infliction of emotion distress." *Id.* Moreover, for the reasons discussed further

below, the Court remands this claim (along with all of Plaintiff's other state law claims) to the state court.

### e. **Equal Protection Claim**

Plaintiff's Amended Complaint does not contain an enumerated equal protection claim. However, Plaintiff's motion for leave to amend expressly states that Plaintiff is seeking to add an "equal protection claim against Defendant officials for failing to treat Plaintiff fairly and equally." (Dkt. 15 at 2). In light of Plaintiff's *pro se* status and in an abundance of caution, the Court has accordingly considered whether Plaintiff has plausibly alleged an equal protection claim.

"A claim of violation of equal protection . . . generally has two elements: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Snyder v. Pugliese*, 144 F. App'x 174, 175 (2d Cir. 2005) (quotation omitted). Moreover, "an individual, not alleging invidious discrimination on the basis of membership in some group, may nevertheless prevail on an equal protection claim provided [he] shows that (1) [he] has been intentionally treated differently from others similarly situated and (2) there is no rational basis for the difference in treatment." *Id.* (quotation omitted). The latter claim is commonly referred to as a "class of one" equal protection claim.

Here, Plaintiff has not plausibly alleged either form of equal protection claim on behalf of Decedent. First, Plaintiff does not allege that Defendants' actions towards

Decedent were motivated by any impermissible considerations, such as Decedent's race or religion. Second, Plaintiff has not alleged that Decedent was treated differently from other members of a similarly situated group of individuals, as is necessary to support a "class of one" equal protection claim. To the extent Plaintiff has attempted to assert an equal protection claim it is subject to dismissal. *See Agee v. Cuomo*, No. 19-cv-0195(MAD)(ML), 2019 WL 3081056, at *4 (N.D.N.Y. July 15, 2019) (dismissing equal protection claim where the plaintiff's allegations "[did] not accuse any of the defendants of treating plaintiff differently based on his membership in a protected class or that he was treated differently than other similarly situated people").

### f.   **Conspiracy Claims**

In addition to the claims set forth above, Plaintiff has also asserted two claims of conspiracy—one under § 1983 and one under 42 U.S. § 1985. "Conspiracy under § 1983 and conspiracy under § 1985 are distinct causes of action with different elements." *Hamilton v. City of N.Y.*, No. 15CV4574CBASJB, 2019 WL 1452013, at *30 (E.D.N.Y. Mar. 19, 2019). However, it is necessary to each of these causes of action that there has been an underlying constitutional violation. *See Miller v. Annucci*, No. 19-cv-0030 (LEK)(ATB), 2019 WL 2370295, at *14 (N.D.N.Y. June 5, 2019) ("A plaintiff's §§ 1983 or 1985 conspiracy claim fails if he is unable to allege the underlying constitutional violation."); *Bibeau v. Soden*, No. 808-CV-0671 LEK/RFT, 2009 WL 701918, at *8 (N.D.N.Y. Mar. 13, 2009) ("[I]f there is no underlying constitutional violation, there can be neither a §§ 1983 or 1985 cause of action for conspiracy."). Here, for all the reasons discussed above, the Court has found that Plaintiff has not plausibly alleged a constitutional

violation.  Accordingly, he cannot succeed on his conspiracy claims under either §§ 1983 or 1985, and those claims must also be dismissed.

### g.     State Sovereign Immunity

The State Defendants have also argued that the State of New York and SUNY Geneseo are immune from Plaintiff's federal claims under the Eleventh Amendment.  The Court agrees and finds that this is a further basis for dismissal of Plaintiff's federal claims as to these defendants.

"The Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015).  "Although Congress is empowered under section five of the Fourteenth Amendment to override Eleventh Amendment immunity, . . . it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of that authority." *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990).  "For Eleventh Amendment purposes, SUNY is an integral part of the government of the State of New York and when it is sued the State is the real party." *Id.* (quotation and alteration omitted).

Plaintiff argues that the State of New York and SUNY Geneseo have waived their sovereign immunity in this case by consenting to removal to federal court, relying on the Supreme Court's decision in *Lapides v. Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613 (2002). (*See* Dkt. 14 at 3).  Plaintiff's reliance on *Lapides* is misplaced. *See Beaulieu v. Vermont*, 807 F.3d 478, 486 (2d Cir. 2015) ("Plaintiffs cite the Supreme Court's opinion in *Lapides v. Board of Regents* as authority for the proposition that by removing a suit to federal court, a state defendant waives the state's general sovereign immunity.  This is a

- 20 -

misreading of *Lapides*."). As the Second Circuit has explained, *Lapides* does not "support[] the proposition that a state waives its general state sovereign immunity by removing an action from state court to federal court." *Id.* Instead, *Lapides* stands for the more limited rule that where a state's immunity has already been waived or abrogated in state court, it cannot escape liability by removing the matter to federal court. *See id.*

Here, the State of New York and SUNY Geneseo would have been immune to Plaintiff's federal claims in New York State Supreme Court, where the action was initially filed. *See* N.Y. Const., art. VI, § 9 (establishing that all claims against the State of New York must be brought in the New York Court of Claims); *cf. Gross v. N.Y,* 428 F. App'x 52, 53 (2d Cir. 2011) ("New York has waived its immunity from liability and consented to be sued only to the extent that claims are brought in the New York Court of Claims."). As such, the removal of this action did not function as a waiver of sovereign immunity, and Plaintiff's §§ 1983 and 1985 claims against the State of New York and SUNY Geneseo must be dismissed on this basis. *See Oliver v. New York State Police,* No. 1:17-CV-01157 EAW, 2019 WL 453363, at *9 (W.D.N.Y. Feb. 5, 2019) (explaining that New York State and its agencies are immune from claims brought under §§ 1983 and 1985).

### h. <u>Municipal Liability</u>

Finally, the Court notes that Plaintiff seeks to assert a municipal liability claim against Livingston County for the alleged misconduct of its employees. "An underlying constitutional violation is a required predicate for municipal liability." *Nardoni v. City of N.Y.,* 331 F. Supp. 3d 116, 125 (S.D.N.Y. 2018). As already explained, there is no plausibly

alleged underlying constitutional violation in this case. The Court therefore finds that Plaintiff's municipal liability claims must be dismissed.

## C.    Plaintiff's State Law Claims are Remanded to State Court

In addition to the federal claims discussed above, Plaintiff has also asserted a number of state law claims. "Where the federal claims have been dismissed in a case which was removed from state court, a district court has discretion to remand the remaining pendent claims *sua sponte* upon a proper determination that retaining jurisdiction over the case would be inappropriate." *Metro Furniture Rental, Inc. v. Alessi*, 770 F. Supp. 198, 202 (S.D.N.Y. 1991). It is generally inappropriate for the Court to retain jurisdiction where all the federal claims have been disposed of at an early stage and there is no basis for diversity jurisdiction over the remaining causes of action. *Id.*; *see also Sunnen v. N.Y. State Dep't of Health*, 544 F. App'x 15, 17 (2d Cir. 2013) ("In situations where the removed federal claims have been dismissed, we have noted that concerns of comity and of federalism . . . encourage remanding to the state courts cases in which state court adjudication can properly claim primacy of interest." (quotation omitted)).

In this case, there is no reason for the Court to retain jurisdiction over Plaintiff's state law claims, many of which involve the interpretation of state officials' duties under state law, and in which the state courts have the primacy of interest. Accordingly, the Court remands all of Plaintiff's remaining state law claims to state court.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for leave to file an amended complaint (Dkt. 15), and deems the Amended Complaint (Dkt. 15-1) the

operative pleading. The Court further exercises its discretion to consider the pending motions to dismiss in light of the Amended Complaint, and finds that Plaintiff has failed to allege a plausible federal cause of action. Accordingly, the Court grants the pending motions to dismiss (Dkt. 2; Dkt. 11) with respect to all of Plaintiff's federal claims. The Court further remands all of Plaintiff's remaining state law claims to state court. The Clerk of Court is instructed to remand this matter to the New York State Supreme Court, Livingston County, and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 20, 2019
Rochester, New York